1   **WO**

2

3

4

5

6                   IN THE UNITED STATES DISTRICT COURT

7                     FOR THE DISTRICT OF ARIZONA

8

9   MICHAEL GOODMAN,                    )   No. CV-07-609-TUC-CKJ
                                        )
10              Plaintiff,              )
                                        )
11  vs.                                 )   **ORDER**
                                        )
12                                      )
    CITY OF TUCSON, a Municipal         )
13  Corporation; ERNIE DURATE, Director )
    of Development Services, both       )
14  individually and in his official capacity; )
    WALTER TELLEZ, Tucson Zoning        )
15  Administrator, both individually and in his )
    official capacity; JOHN ROES        )
16  1-20; and JANE ROES 1-20,           )
                                        )
17              Defendants.             )
                                        )
18  _____ )

19

20          Pending before this Court are Defendants' Motion for Summary Judgment and Motion

21  to Dismiss for Failure to State a Claim for Relief [Doc. # 16] and Plaintiff's Motion for

    Partial Summary Judgment as to Counts 1 and 2 of Complaint [Doc. #62]. Additionally, the
22
    parties have submitted supplemental briefs regarding the Board of Adjustment's decision as
23
    to any vested rights issue. In its discretion, the Court finds this case suitable for decision
24
    without oral argument. *See* LRCiv. 7.2(f). The Parties have adequately presented the facts
25
    and legal arguments in their briefs and supporting documents, and the decisional process
26
    would not be significantly aided by oral argument.
27

28

1      **I.      FACTUAL BACKGROUND[1]**

2          Plaintiff Michael Goodman ("Goodman") is the owner of eight lots in Tucson,

3      Arizona, which he sought to develop.  In 2003, Goodman obtained City approval for the

4      reconfiguration of the eight separate residential lots and obtained building permits for six of

5      the parcels.   These approvals did not authorize development of the site as a unified site.[2]

6      The permits were valid for 180 days and could be extended by all means identified in the

7      Development Code.  Goodman began site improvements which included grading and land

8      disturbance, as well as construction of two buildings.

9          On November 1, 2005, Goodman was cited by the City because his construction

10     violated the City's Stormwater Management Regulations, Tucson Code § 26-20 *et. seq.*

11     More precisely, Goodman was cited for failure to have a Storm Water Pollution Prevention

12     Plan (SWPPP) and Notice of Intent (NOI) as required pursuant to Tucson Code § 26-40(7)(a)

13     and (b).  A SWPPP is only required when the construction is for a unified project that is more

14     than one acre.    Here, each individual lot was less than one acre.    *See* 40

15     C.F.R.122.26(6)(14)(x).

16         Enforcement of a SWPPP is performed by the Development Services Department as

17     part of the development review and approval process.  Plaintiff was not required to have a

18     SWPPP for independent construction of each of the eight lots to be developed as single

19     independent lots.  On January 3, 2006, Goodman pled "responsible" for the violation of not

20

21     ───────────────────

22         [1]The factual background is derived from Defendants' Statement of Undisputed Facts
       (USOF) [Doc. #66], except where otherwise noted.  The USOF was submitted in opposition
23     to Plaintiff's Motion for Partial Summary Judgment [Doc. #62].

24         [2]Goodman disputes the meaning of "unified site" arguing that it is not defined in the
25     Land Use Code or Development Code and the question of what work was authorized under
       his approved building permits; however, the affidavit of the Deputy Director of the
26     Development Services Department/Zoning Administrator on which Defendant relies clearly
       states that the permits authorized individual development of each parcel and that the work
27     could go on concurrently. *See* Defs.' Statement of Facts in Support of Motion for Summary
       Judgment ("Defs.' SOF") Exh. "1" [Doc. # 17].
28

having a SWPPP, which was accepted and entered by the court.[3]  Goodman was informed during hearings in City Court that he was required to submit a SWPPP, a comprehensive site plan and grading plan showing how he was actually developing the property as a single site.[4] The City Court held multiple compliance hearings while Goodman attempted to comply with the court's orders.[5]  Ultimately, on August 25, 2006, the City Court concluded that Goodman had failed to abate the violation and referred the case for criminal prosecution to abate and fined Goodman the maximum fine allowed by ordinance.

Goodman has never disputed nor appealed the plea of responsibility.  Goodman did, however, appeal the City Court direction to submit a comprehensive site plan to the Pima County Superior Court.  Pima County Superior Court Judge Bernini issued a decision stating that the City Court's direction was an "abuse of discretion" and exceeded the court's jurisdiction.  The City filed a petition for special action for review of the Superior Court order.  The Arizona Court of Appeals granted the special action and issued a decision that reversed the Superior Court decision and reinstated the City Court decision.  Goodman filed a Petition for Review with the Arizona Supreme Court which was denied on June 3, 2008.

Following the plea of responsibility for the SWPPP violation, the City Court directed Goodman to submit a site plan showing the unified site development of the eight (8) lots. Goodman submitted a site plan with all eight separate parcels plotted on a single map along with a SWPPP; however, Goodman's plan treated the eight individual lot as a single site for purposes of grading and the SWPPP. *See* Complaint ¶ 30-31. The City approved

---

[3]A plea of responsible equates to a guilty plea. *See, e.g.,* 17C A.R.S. Traffic Violation Cases Civ. Proc. Rules, Rule 24.

[4]Goodman disputes that he was "inform[ed]" of "what plans had to be submitted and approved for him to continue development of his site."  But Goodman fails to offer any admissible evidence to dispute the court record. *See* Defs.' Exh. "4" at 11 and Defs.' Exh. "1" ¶ 13).]

[5] Goodman disputed this statement; however, this Court finds that the Court transcripts relied upon by Defendants speak for themselves.

1    development of eight (8) individual lots and issued permits based on that representation.  The

2    single site development did not conform to the requirements of those permits.  *See id.*  On

3    January 19, 2006, the City's Development Services Department ("DSD") issued a stop work

4    order on further construction.  The letter stated that the stop work order was based upon the

5    fact that the approved site plans were inconsistent with the development of the site, the site

6    was being graded as a single site without the required grading plan and the site plans

7    submitted provided for common infrastructure that had not been established by approved

8    easements.[6]   Goodman sought to appeal the stop work order, but was informed that the

9    decision that the plan was for a unified site was a zoning determination that was not

10   appealable to the Board of Appeals that had limited jurisdiction to hear matters concerning

11   the building code.  On or about January 26, 2007, a SWPPP for the site was approved by

12   DSD.  The approval abated the SWPPP violation, resolved the inconsistency between the

13   existing development and the remaining issues in the stop work order approved plans,

14   allowing completion of two structures.  The City has allowed all development that is

15   consistent with that approved SWPPP.[7]  Between the issuance of the stop work order and the

16   approval of the SWPPP, Goodman never submitted a site plan for the full site that resolved

17   the conflict between the originally approved plans and permits and the actual construction.

18   Goodman also did not have an approved grading plan and did not show that common

19   infrastructure was established through easements.

20          The Zoning Administrator determined that the plan submitted to comply with the City

21   Court orders was for a single site that did not conform to zoning.  That decision was appealed

22

23

24          [6]Goodman objects to this contention, stating that the City never provided any notice
        that his construction activities were inconsistent with his issued permits.  PSOF 78-80.  The
25      Court, however, cannot find the supporting evidence for this statement in the record before
        it.
26

27          [7] Goodman objects stating that the new plans were an effort to mitigate the losses
        associated with the two partially completed and deteriorating structures; however, the effect
28      of the new plans was to abate the SWPPP violation.

- 4 -

1  to the Board of Adjustment, which affirmed the Zoning Administrator.[8]   The Zoning

2  Administrator had informed the Board of Adjustment that he had not determined the validity

3  of the permits, the issue of vested rights, or that the Plaintiff could not use those permits in

4  the future.  As such, the Board's motion to affirm the Zoning Administrator did not include

5  those issues.

6       Goodman appealed the Board of Adjustment decision to the Pima County Superior

7  Court, which affirmed the decision.  Judge Miller of the Superior Court specifically found

8  that: "[f]rom the evidence presented to the Board it appears that the only actions undertaken

9  by Goodman on a separate, lot-by-lot basis were the separate applications for development

10 plans and building permits.  All other actions by Goodman, from design to infrastructure,

11 were undertaken on an aggregate, unified basis."[9]  Judge Miller's decision was appealed to

12 the Arizona State Court of Appeals.  The Court of Appeals reversed the decision stating that

13 the Board of Adjustment had abused its discretion by not considering Goodman's vested

14 rights claim and the Zoning Administrator's revocation of Goodman's permits.  The court

15 remanded, however, solely on the basis of the permit revocation.

16      On remand, the Board of Adjustment excised the portion of the Zoning

17 Administrator's letter stating that Goodman's permits were no longer in effect.  Neither the

18 Zoning Administrator or the Board of Adjustment have ever addressed Plaintiff's vested

19 rights claims, nor has any other state regulatory board or court.

20

21 **II.     STANDARD OF REVIEW**

22      Summary judgment is appropriate when, viewing the facts in the light most favorable

23 to the nonmoving party, *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986), "there

24

25 ───────────────

26      [8]Goodman asserts that he appealed the revocation of his existing permits as well;
   however, that decision was never put before the Board of Adjustment.

27      [9]*Goodman v. City of Tucson, et al.*, Pima County Superior Court Case No.
28 C20064613, Under Advisement Ruling at 6 (Mar. 29, 2007).

is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  Thus, factual disputes that have no bearing on the outcome of a suit are irrelevant to the consideration of a motion for summary judgment.  *Id*.  In order to withstand a motion for summary judgment, the nonmoving party must show "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Moreover, a "mere scintilla of evidence" does not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 252.  The United States Supreme Court also recognized that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, — U.S. —, —, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

## III.   ANALYSIS

As an initial matter, this Court must consider whether it has jurisdiction to hear Goodman's claims.  "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994).  "The jurisdiction of federal courts is defined and limited by Article III of the Constitution." *Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed. 947 (1968).  Additionally, jurisdiction may be conferred upon the federal courts by statute. *Kokkonen*, 511 U.S. at 377, 114 S.Ct. at 1675.  Moreover, the United States Supreme Court recognizes several doctrines which define the constitutional and prudential limitations on the federal courts' power to hear cases. *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).  Included among these are the concepts of standing, mootness, ripeness and political questions.  *Id*.  Prior to invoking the power of the federal court, it must be determined "whether the litigant is entitled to have the court decide the merits of the dispute

1    or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d

2    343 (1975).

3

4            *A. Vested Rights Claims*

5            "Ripeness is a justiciability doctrine designed to 'prevent the courts, through

6    avoidance of premature adjudication, from entangling themselves in abstract disagreements

7    over administrative policies, and also to protect the agencies from judicial interference until

8    an administrative decision has been formalized and its effects felt in a concrete way by the

9    challenging parties.'" *National Park Hospitality Assoc. v. Dept. of the Interior*, 538 U.S. 803,

10   807-08, 123 S.Ct. 2026, 2030, 155 L.Ed.2d 1017 (2003).   Further, "a claim that the

11   application of government regulations effects a taking of a property interest is not ripe until

12   the government entity charged with implementing the regulations has reached a final decision

13   regarding the application of the regulations to the property at issue." *Williamson County*

14   *Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S.Ct.

15   3108, 3116, 87 L.Ed.2d 126 (1985).

16           The United States Supreme Court in *Williamson County* passed on plaintiff's putative

17   Fifth Amendment takings and due process claims because the claims were premature.   *Id.* at

18   185, 105 S.Ct. at 3116.   In its examination of the ripeness doctrine, the Court delineated a

19   two-part test.   *See id.*   First, the property owner must demonstrate that the government has

20   reached a final decision regarding the "application of the regulations to the property at issue."

21   *Id.* at 186, 105 S.Ct. at 3116.   Second, the property owner must "seek compensation through

22   the procedures the State has provided for doing so."   *Id.* at 194, 105 S.Ct. at 3120.   In

23   explaining the contours of the Fifth Amendment the Court stated:

24           The Fifth Amendment does not proscribe the taking of property; it proscribes
             taking without just compensation.   *Hodel v. Virginia Surface Mining &*
25           *Reclamation Assn., Inc.*, 452 U.S., at 297, n. 40, 101 S.Ct., at 2371, n. 40.   Nor
             does the Fifth Amendment require that just compensation be paid in advance
26           of, or contemporaneously with, the taking; all that is required is that a
             "'reasonable, certain and adequate provision for obtaining compensation'"
27           exist at the time of the taking.   *Regional Rail Reorganization Act Cases*, 419
             U.S. 102, 124-125, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974) (quoting

28

*Cherokee Nation v. Southern Kansas R.Co.*, 135 U.S. 641, 659, 10 S.Ct. 965, 971, 34 L.Ed. 295 (1890)).

*Williamson County*, 473 U.S. at 194, 105 S.Ct. at 3120.  Moreover, "a person deprived of property through a random and unauthorized act by a state employee does not state a claim under the Due Process Clause merely by alleging the deprivation of property." *Id.* at 195, 105 S.Ct. 3121.   "[T]he State's action is not 'complete' in the sense of causing a constitutional injury 'unless or until the State fails to provide an adequate postdeprivation remedy for the property loss.'" *Id.* (internal citations omitted).

The respondent in *Williamson County* owned "a tract of land it was developing as a residential subdivision." *Id.* at 175, 105 S.Ct. at 3110.  The property owner brought suit alleged that the application of various zoning laws and regulations of its property amounted to a "taking." *Id.* at 175, 105 S.Ct. at 3111.  During the property owner's ongoing development of the subdivision, the county changed its zoning ordinances regarding the calculations of allowable density and the number of allowable units per acre. *Id.* at 178, 105 S.Ct. at 3112.  Although the property owner had submitted its original preliminary plat in 1973, which had been re-approved on several occasions, the owner's revised preliminary plat submitted in 1980 was disapproved. *Williamson County*, 473 U.S. at 180-81, 105 S.Ct. at 3113-14.  This rejection was based on several reasons including density and grade problems. *Id.*  The Court determined that the property owner had failed to avail itself to the administrative remedies available, e.g., seeking a variance from the density and grade requirements, and as such there was no final decision as to how the regulations would be applied to the owner's property. *Id.* at 197, 200, 105 S.Ct. at 3122, 3123.  Therefore, the property owner's claims were not ripe for review. *Id.*

Subsequently, the Supreme Court has consistently reaffirmed the ripeness test delineated in *Williamson County*. *See MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986); *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997).  The Court in *MacDonald* declined jurisdiction where a property owner alleged a "taking" based on the planning

1  commission's denial of its subdivision plan. *MacDonald*, 477 at 342, 106 S.Ct. at 2563. The

2  county's board of supervisors upheld the commission's decision citing several reasons for

3  the denial.  *Id.*  The Court recognized that "local agencies charged with administering

4  regulations governing property development are singularly flexible institutions; what they

5  take with the one hand they may give back with the other." *Id.* at 350, 106 S.Ct. at 2566.

6  Moreover, until an assessment of how the governmental entity will apply zoning ordinances

7  and subdivision regulations to a specific property is made, the constitutionality of those

8  regulations cannot be made. *Id.* at 350-51, 106 S.Ct. at 2566-67.

9      The Court reiterated this logic in *Suitum v. Tahoe Regional Planning Agency*, 520

10  U.S. 725, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997).  The Court found the property owner's

11  claims to be justiciable, however, because the rights in question were Transferrable

12  Development Rights, and there was no question regarding how the regulation applied to

13  those rights.  *Suitum*, 520 U.S. at 739, 117 S.Ct. at 1667.  Moreover, there was no

14  discretionary decision to be made by any agency official.  *Id.* at 739-40, 117 S.Ct. at 1667-

15  68. Additionally, the agency introduced evidence from a real estate appraiser regarding the

16  value of those rights.  *Id.* at 732, 117 S.Ct. at 1664.  Thus, the claim was ripe for review.

17      Additionally, the Ninth Circuit has recognized a futility exception to the ripeness

18  doctrine.  *See Kinzli v. City of Santa Cruz*, 818 F.2d 1449 (9th Cir. 1987).  "Under this

19  exception, the requirement of the submission of a development plan is excused if such an

20  application would be an 'idle and futile act.'" *Id.* at 1454 (citations omitted).  The Kinzlis

21  owned property adjacent to the Santa Cruz city limits. *Id.* at 1451. Although the surrounding

22  area became urban in its development, the Kinzlis' property remained rural.  *Id.*  The Kinzlis

23  had discussions with the city regarding potential development of a road on the property, but

24  this development never came to pass.  *Id.*  Subsequently, Santa Cruz adopted an ordinance

25  to limit the uses available to greenbelt properties, including the Kinzlis'.  *Kinzli*, 818 F.2d

26  at 1452. The Kinzlis sought to sell the property to a developer contingent upon the receipt

27  of permits.  *Id.* at 1451.  Although the developer initially sought permits, it did not follow

28  through, and the Kinzlis did not seek any permits of their own accord.  *Id.* at 1452.  The

1    Kinzlis brought suit alleging that the city had abridged their constitutional and civil rights.

2    *Id.*  The court held that because the Kinzlis had "failed to secure a 'final decision' from the

3    City regarding acceptable uses, and the futility exception [did] not excuse this failure since

4    no 'meaningful application' had been made[,]" any takings claim was not ripe.  *Id.* at 1455.

5    This finding further resulted in the court finding that the Kinzlis' due process and equal

6    protection claims were not ripe.  *Kinzli*, 818 F.2d at 1455-56.

7         Here, Goodman relies on the futility exception outlined in *Kinzli* to justify the ripeness

8    of his claims.  Goodman argues that because the code has changed since the issuance of his

9    original permits, any attempt to comply with the City's requirements would be futile.  This

10   argument misses the mark.  Both parties agree that the Board of Adjustment has never

11   addressed Goodman's vested rights claim.[10]  Further, any vested rights claim possessed by

12   Goodman contemplates a remedy irrespective of whether or not the City's zoning ordinances

13   have changed.  Unless and until the Board issues a final decision regarding Goodman's

14   vested rights, there is no assessment of how the governmental entity will apply zoning

15   ordinances and subdivision regulations to Goodman's property.  Thus, the constitutionality

16   of those regulations cannot be made, and this Court is without jurisdiction to hear his claim.

17   Further, Goodman's takings claims can only be construed in the nature of a vested rights

18   claim.  As will be discussed *infra*, the alleged "taking" does not comport with the United

19   States Supreme Court's Fifth Amendment takings jurisprudence.  As such, this Court finds

20   Goodman's vested rights claims not ripe.

21   . . .

22   . . .

23   . . .

24

25       [10]Regarding vested rights, Arizona recognizes the "general rule is that any substantial

26   change of position, expenditures, or incurrence of obligations under a building permit entitles
     the permittee to complete the construction and use the premises for the purpose authorized

27   irrespective of subsequent zoning or changes in zoning." *Fidelity Nat'l Title Ins. Co. v. Pima*

28   *County*, 171 Ariz. 427, 831 P.2d 426 (Ct.App. 1992) (citations omitted).

1

      *B.  Fifth Amendment "Takings" Claim*

2          The Fifth Amendment mandates that private property shall not "be taken for public

3 use, without just compensation." U.S. CONST. amend. V.  The United States Supreme Court

4 has recognized "that the 'Fifth Amendment's guarantee . . . [is] designed to bar Government

5 from forcing some people alone to bear public burdens which, in all fairness and justice,

6 should be borne by the public as a whole.'" *Penn Central Transportation Co. v. City of New*

7 *York*, 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (quoting *Armstrong*

8 *v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).  Further, the

9 Fifth Amendment is not designed "to limit the governmental interference with property rights

10 *per se*, but rather to secure *compensation* in the event of otherwise proper interference

11 amounting to a taking." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537, 125 S.Ct. 2074,

12 2080, 161 L.Ed.2d 876 (2005) (internal citations omitted) (emphasis in original).

13          In *Lingle*, the Court reviewed the various takings theories recognized by its

14 jurisprudence. *See id.*  First, is the actual, physical invasion or appropriation of private

15 property by the government. *Id.* at 537, 125 S.Ct. at 2081.  Next, the Court addressed

16 "regulatory takings," in which the "government regulation of private property . . . [is] so

17 onerous that its effect is tantamount to a direct appropriation or ouster." *Id.*  The Court

18 recognized two types of regulatory takings that result in a *per se* taking under the Fifth

19 Amendment. *Id.* at 538, 125 S.Ct. at 2081.  The first of these is where "government requires

20 an owner to suffer a permanent physical invasion of her property." *Lingle*, 544 U.S. at 538,

21 125 S.Ct. at 2081.  The Court's benchmark case of this type of taking is *Loretto v.*

22 *Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

23 In *Loretto*, a New York City landlord sued pursuant to the Fifth and Fourteenth Amendments

24 for just compensation because a New York state law required landlords to allow cable

25 companies to install cable facilities on their property. *Loretto*, 458 U.S. at 421, 102 S.Ct. at

26 3169.  The cable facilities consisted of cable wires running along the building rooftops, with

27 occasional wires running down the side of the building, as well as metal boxes that were

28 installed along the roof cables. *Id.* at 422, 102 S.Ct. at 3169.  These cables formed a "cable

highway" that networked buildings throughout the City. *See id.* The Court held that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Id.* at 426, 102 S.Ct. at 3171. Thus, despite the relative small area occupied by the cable equipment, the permanent physical occupation warranted just compensation. *Id.* at 441, 102 S.Ct. at 3179.

The second regulatory taking that results in a *per se* Fifth Amendment violation are those government regulations that "completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Lingle*, 544 U.S. at 538, 125 S.Ct. at 2081 (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)) (emphasis in original). In *Lucas*, the property owner bought two residential lots on which he intended to build single-family homes. *Lucas*, 505 U.S. at 1006-07, 112 S.Ct. at 2889. Prior to the owner beginning construction on the property, the South Carolina Legislature enacted a statute "which had the direct effect of barring petitioner from erecting any permanent habitable structures on his two parcels." *Id.* at 1007, 112 S.Ct. at 2889. The South Carolina statute was designed to preserve South Carolina's beaches and prevent further erosion thereof. *Id.* at 1008-09, 112 S.Ct. at 2889-90. The Court held that where a regulation "deprives land of all economically beneficial use[,]" compensation is required unless "the proscribed use interests were not part of his title to begin with." *Id.* at 1028, 112 S.Ct. 2900. Because the Court determined that the owner's property had been rendered valueless, just compensation was due. *See id.*

The third category of regulatory takings are "land-use exactions." *Lingle*, 544 U.S. at 546, 125 S.Ct. at 2086. In this circumstance, the government demanded an easement as a precondition to receipt of a permit. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *Dolan v. City of Tigard*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). The Court in *Nollan* held that such an exaction was permissible so long as it would substantially advance the same governmental interest that would otherwise be grounds for denial of the permit. *Nollan*, 483 U.S. at 834-47, 107 S.Ct.

1   3141.  Moreover, the Court recognized that such an exaction must be roughly proportional

2   to the impact of the proposed development.  *Dolan*, 512 U.S. at 391, 114 S.Ct. 2309.

3        All other regulatory takings are governed by *Penn Central*, 438 U.S. 104, 98 S.Ct.

4   2646, 57 L.Ed.2d 631 (1978).  The Court in *Penn Central* recognized several factors in

5   assessing whether or not a regulation effects a "taking" requiring compensation.  These

6   included "[t]he economic impact of the regulation on the claimant and, particularly, the

7   extent to which the regulation has interfered with distinct investment-backed expectations[,]"

8   as well as "the character of the governmental action."  *Penn Central*, 438 U.S. at 124, 98

9   S.Ct. at 2659.  With regard to this last factor, the Court noted a physical invasion of property

10  is more likely to result in a "taking" than "when interference arises from some public

11  program adjusting the benefits and burdens of economic life to promote the common good."

12  *Id.*

13       In the instant case, Goodman obtained six (6) building permits for the eight (8) lots

14  that he owned.  Based on these building permits, Goodman was entitled to develop six of his

15  lots individually.  Because each lot was less than one acre in size, a SWPPP was not required,

16  nor was a NOI.  When it appeared Goodman was developing his lot as one large unit, which

17  was greater than one acre in size, he was cited for a failure to have a SWPPP and NOI.

18  Goodman then pled "responsible" to this charge.  Goodman now claims that this plea was

19  simply because he did not have a SWPPP or NOI, not because he was developing the six lots

20  as a single, unified site.  Even if this is true, pleading responsible is an admission of guilt.

21  *See* 17 A.R.S. Traffic Violation Cases Civ. Proc. Rules, Rule 24 (plea of responsible equates

22  to a guilty plea).  If Goodman had been developing the lots per his approved building

23  permits, he would not have been required to have a SWPPP or NOI, and there would have

24  been no reason for him to plead guilty.  These events ultimately led to the issuance of the

25  stop work order, and the Zoning Administrator's letter stating that all of Goodman's existing

26  permits were revoked.  Although Goodman eventually submitted a SWPPP and NOI for two

27  of the lots, thereby abating his noncompliance with the City's requirements, he has failed to

28

adduce any evidence demonstrating that he attempted to work with City officials to abate the issues regarding the four other lots for which Goodman held permits.

Goodman does not and cannot contend that the City's actions involved a physical invasion or appropriation of his property. *Cf. Loretto*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Nor is this a circumstance of a land-exaction in exchange for issuance of permits. *Cf. Nollan*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *Dolan*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). Goodman does contend that the City's actions deprived him of all economically beneficial use of his property; however, Goodman is not entitled to the "most beneficial use of the property." *See Penn Central*, 438 U.S. at 127, 98 S.Ct. at 2660. Moreover, Goodman could have sought to pursue development under his original permits, but did not. There is nothing before this Court to suggest that the City's actions prevented Goodman from the reasonable use of his property. Furthermore, as the United States Supreme Court recognized:

> [T]he Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. The Clause expressly requires compensation where government takes private property "*for public use.*" It does not bar government from interfering with property rights, but rather requires compensation "in the event of *otherwise proper interference* amounting to a taking."

*Lingle*, 544 U.S. at 543, 125 S.Ct. at 2084 (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)) (emphasis in original). Whether or not a regulation is valid is a separate and distinct inquiry properly brought under a due process theory. *See Lingle*, 544 U.S. at 543, 125 S.Ct. at 2084.

Although Goodman is correct that a "temporary" taking requires compensation pursuant to the Fifth Amendment, the property deprivation must still constitute a taking under Supreme Court precedent. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Justice Stevens recognized two broad categories of temporary harms resulting from regulatory takings, describing them as follows:

(1) those that result from a deliberate decision to appropriate certain property for public use for a limited period of time; and (2) those that are a by-product of governmental decisionmaking. The first subcategory includes, for example, the condemnation of a laundry to be used by the military for the duration of World War II, or the condemnation of the unexpired term of a lease, that type of appropriation is correctly characterized as a "temporary taking." The second subcategory is fairly characterized as an inevitable cost of doing business in a highly regulated society. . . . [I]n a challenge to a governmental regulation – whether it be a zoning ordinance, a health regulation, or a traffic law – [a property owner] is almost certain to suffer some temporary harm in the process. At the least, he will usually incur significant litigation expenses and frequently he will incur substantial revenue losses because the use of his property has been temporarily curtailed while the dispute is being resolved.

*Williamson County*, 473 U.S. at 203-4, 105 S.Ct. at 3125-26 (Stevens, J., concurring) (internal citations omitted). Furthermore, Goodman does not have "a constitutionally-protectible property right to develop [his] property in contravention of Arizona's . . . laws." *Carr Huml Investors, LLC v. Arizona*, 2007 WL 4403981 at 11 (D.Ariz.). Based upon the evidence before this Court, Goodman cannot establish a Fifth Amendment "taking."[11] The Court further notes, however, that because Goodman's inverse condemnation action pursuant to Arizona state law is still pending, that it remains possible he will prevail under this theory, yet not obtain "just compensation." *See, Williamson County*, 473 U.S. at 186, 105 S.Ct. at 3116. As such, this Court will dismiss Goodman's Fifth Amendment "takings" claim as unripe, and dismiss his § 1983 "takings" claim for failure to state a claim.

### C. Substantive and Procedural Due Process

Goodman alleges both substantive and procedural due process violations in the revocation of his permits. As noted, *supra*, whether or not a regulation is valid is a separate and distinct inquiry properly brought under a due process theory. *See Lingle*, 544 U.S. at 543, 125 S.Ct. at 2084. Moreover, whether the City has exercised its power in a manner that

---

[11]The Court notes that the explicit language of the Fifth Amendment preempts any "takings" claim pursuant to 28 U.S.C. § 1983. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (analyzing claim brought pursuant to the Fourth Amendment and Due Process Clauses under the explicit language of the Fourth Amendment rather than the more generalized "substantive due process").

1   "fails to serve any legitimate governmental objective [and is] so arbitrary or irrational that

2   it runs afoul of the Due Process Clause" is a valid challenge to a deprivation of property.

3   *Lingle*, 544 U.S. at 542, 125 S.Ct. at 2083; *See also, Kerley Industries, Inc. v. Pima Co.*, 785

4   F.2d 1444 (9th Cir. 1986) (considering whether government's revocation of conditional use

5   permit violated due process protections). Despite the propriety of the legal theory, however,

6   it is still unresolved how the City will apply its regulations to Goodman's property. As noted

7   previously, Goodman's vested rights claim remains unripe, and any putative Fifth

8   Amendment takings claim is unripe. Until there is resolution as to these claims, this Court

9   cannot fully assess the adequacy of Goodman's due process claims, because he has not yet

10  fully availed himself of the procedures afforded him by the government. Therefore, the

11  Court finds Goodman's due process claims unripe for adjudication.

12

13       Accordingly, IT IS HEREBY ORDERED:

14       1.   Defendants' Motion for Summary Judgment and Motion to Dismiss for Failure

15  to State a Claim for Relief [Doc. # 16] is GRANTED in part and DENIED in part;

16       2.   Count I of Plaintiff's Complaint regarding a Fifth Amendment taking is

17  DISMISSED AS UNRIPE;

18       3.   Count III of Plaintiff's Complaint regarding his Vested Rights is DISMISSED

19  AS UNRIPE;

20       4.   Count IV of Plaintiff's Complaint regarding his Substantive and Procedural

21  Due Process rights is DISMISSED AS UNRIPE;

22       5.   Count V of Plaintiff's Complaint regarding a "taking" pursuant to 28 U.S.C.

23  § 1983 is DISMISSED as preempted by Count I.

24       6.   Plaintiff's Motion for Partial Summary Judgment as to Counts I and II of

25  Complaint [Doc. #62] is DENIED;

26       7.   All other motions pending before this Court are DENIED AS MOOT;

27       8.   This case as to Count II is REMANDED to Pima County Superior Court

28  (Cause # C20074158);

1    9.    The Clerk of the Court shall mail a certified copy of this Order to the Clerk of

2  the Pima County Superior Court; and

3    10.    The Clerk of the Court shall then close its file in this matter.

4

5  DATED this 21st day of April, 2009.

6

7  _____

Cindy K. Jorgenson

8  United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 17 -